No. 5:06-CV-170-BR

| | |
|---|---|
| DAVID KAGAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | ORDER |
| S.C. MOSLEY, individually and in ) | |
| his official capacity, CITY OF FAYETTEVILLE, ) | |
| NORTH CAROLINA, a municipal corporation, ) | |
| EARL R. BUTLER, SHERIFF OF ) | |
| CUMBERLAND COUNTY, in his official ) | |
| capacity, L.A. CHRISTIAN, individually and in ) | |
| her official capacity, WESTERN SURETY ) | |
| COMPANY, and GREYHOUND LINES, INC., ) | |
| a wholly owned subsidiary of LAIDLAW ) | |
| INTERNATIONAL, INC., ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on the motion for summary judgment of the remaining defendants S.C. Mosley and the City of Fayetteville ("Fayetteville"). Plaintiff filed a response in opposition to the motion, and defendants have replied. The motion is ripe for disposition.

I. PROCEDURAL AND FACTUAL BACKGROUND[1]

This is an action for compensatory and punitive damages brought pursuant to the provisions of 42 U.S.C. § 1983 and state law, all based upon the alleged wrongful arrest of plaintiff by

---

[1] The record contains several minor factual discrepancies, which the court concludes do not preclude entry of summary judgment. In cases such as these,
> a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer. For that reason, minor discrepancies in testimony do not create a material issue of fact . . . , particularly when, as here, the witness views the event from a worse vantage point than that of the officers.

Anderson v. Russell, 247 F.3d 125, 130 (4th Cir. 2001).

defendant Mosley, a Fayetteville police officer at the time of the events giving rise to the complaint.[2] Plaintiff is a Russian immigrant who came to the United States in 1989. (Pl. Dep. at 13-14.) On 23 April 2003, plaintiff was a ticketed passenger on a bus operated by defendant Greyhound en route from New York City to his home in Florida. (Compl. ¶¶ 17-18; Pl. Dep. at 49.) The bus departed from the Raleigh terminal at approximately 9:30 p.m., and plaintiff took a prescription sleeping aid.[3] (Compl. ¶ 21; Pl. Dep. at 47.)

When the bus arrived in Fayetteville, the passengers were instructed to disembark so that the bus could be cleaned. (Pl. Dep. at 48.) Plaintiff "has little memory of the events that occurred later that night." (Br. Opp. Mot. Summ. J. at 3 (citing Pl. Dep. at 54-61).) He recalls exiting the bus, sitting on a bench, and feeling that he was "losing consciousness." (Pl. Dep. at 48.) When he got back on the bus, he only remembers taking his seat and falling asleep. (Id. at 51.) Plaintiff apparently boarded the wrong bus in Fayetteville, a northbound bus heading from Florida back up to New York, although it was being operated by the driver who had operated plaintiff's bus from New York to Fayetteville. (Gaines Dep. at 7-8.) Plaintiff does not remember being asked to get off the bus or being asked to show his ticket by Greyhound employees, although Mosley "[m]aybe . . . was saying something regarding ticket or something" before he handcuffed plaintiff. (Id. at 51-53.)

Mosley was on duty on the night of 23 April 2003, and was dispatched by the Fayetteville Police Department to the Greyhound bus station. (Mosley Dep. at 14.) Edward Gaines, a Greyhound employee and the Fayetteville terminal supervisor at the time of the events giving rise

---

[2] Mosley resigned from the Fayetteville Police Department in August 2003 and is now employed by Cumberland County as its network information systems manager. (Mosley Dep. at 8-9.)

[3] There is evidence that plaintiff may have taken twice the dosage. (Pl. Exh. 84 (jail nurse's examination notes stating plaintiff "claimed that he took 2 sleeping pills instead of one").)

2

to the complaint, met him in front of the bus station and told him that a passenger was "refusing to show a ticket and . . . needed to be removed."[4] (Id. at 15; Gaines Dep. at 3.) Mosley boarded the bus, approached plaintiff (based on Gaines' identification of plaintiff as the passenger refusing to show a ticket), and "asked him did he have a ticket." (Mosley Dep. at 17-18.) Mosley hoped to "defuse the situation" by having plaintiff produce a ticket and allow plaintiff to remain on board the bus. (Id. at 18.) Plaintiff "g[ave him] a real angry stare and . . . just kind of sh[ook] his head" but did not say anything. (Id.; see also Gaines Dep. at 11 (plaintiff's "eyes were fixed . . . . [a]nd he just kind of looked directly as if he were looking through" Mosley but did not say anything).) Mosley "asked him twice more could he show . . . a ticket . . . . and told him . . . that if he couldn't produce a ticket they [Greyhound] were asking that he be removed." (Mosley Dep. at 18.) As Mosley repeated his requests for plaintiff to produce his ticket,[5] plaintiff "continued with the staring . . . and got more and more tensed up and swinging himself around in the seat" to the point that Mosley became "really afraid that [plaintiff] was about to jump up and hit" Mosley. (Id. at 19.) However, plaintiff never verbally threatened Mosley. (Id. at 20.) Mosley asked plaintiff several times to "step off" the bus, and plaintiff "began frailing [sic] his arms and elbows to the point where he actually struck [Mosley] with his arm . . . ." (Id.) Mosley then handcuffed plaintiff, and they "exited the bus and stopped some distance from [Mosley's] patrol vehicle on the sidewalk." (Id. at 21-22.)

Plaintiff fell down on the platform after exiting the bus, and blames the fall on being sleepy

---

[4] Gaines testified that he remained on the bus until Mosley arrived "because [Gaines] didn't want nothing to happen to anybody on that bus while he [plaintiff] was on there." (Gaines Dep. at 10.)

[5] Although "[t]he Greyhound bus station maintains a sign which warns passengers the right of search [sic] of their luggage and person[,]" neither Greyhound nor Mosley searched plaintiff "or his baggage . . . to determine his identity or whether he carried a ticket." (Br. Opp. Mot. Summ. J. at 5 (citing Exhibit DK 0853 Supplement to Plaintiff's Rule 26 Disclosures; Mosley Dep. at 70, 114).)

3

and Mosley "not holding" him. (Pl. Dep. at 55-58; see also Boose Dep. at 24 (Mosley told intake jailer that plaintiff "fell down off the bus").) Mosley testified that plaintiff did not fall as he was exiting the bus, but rather plaintiff "spun" away from Mosley and "trip[ped] over the edge of the curbing" when Mosley asked plaintiff to get into the patrol vehicle.[6] (Mosley Dep. at 24, 27; see also Gaines Dep. at 13-15.) As plaintiff and Mosley approached Mosley's patrol vehicle, Gaines and Henry observed plaintiff "trying to escape" or being "defiant against being put inside the car[.]" (Gaines Dep. at 14; see also Henry Dep. at 30 ("when it come time to get in the back seat of the police car [plaintiff] wasn't planning on going back there, so he went to kind of snatch away").)

Plaintiff fell on his face and left shoulder, and Mosley "stepped on [his] toe." (Pl. Dep. at 58.) Plaintiff sustained "a severely broken clavicle and injuries to his shoulder, cracked ribs, facial lacerations and injuries to his left foot and toe." (Compl. ¶ 49.) Mosley "called a supervisor and for medical attention." (Mosley Dep. at 29.) Paramedics examined plaintiff[7] and "g[a]ve [Mosley] a form that [plaintiff] refused medical treatment and said that . . . the only thing wrong with [plaintiff] was superficial" injuries. (Id. at 35.) Mosley reviewed the events with his supervisor "to make sure that . . . [he] had the right charge" on which to arrest plaintiff. (Id. at 38.)

Mosley charged plaintiff with a violation of N.C. Gen. Stat. § 14-275.1, Disorderly Conduct at a Bus Station, and took him before a magistrate, who committed plaintiff to the custody of the jail. (Mosley Dep. at 91-92.) The deputy chief jailer (Morin) and a jail nurse examined plaintiff in the

---

[6] Mosley also testified that he parked his patrol vehicle two to three feet from the curb in front of the bus station when he arrived at the station, (Mosley Dep. at 34), while Greyhound employees Gaines and Henry testified that Mosley's vehicle was one foot from the curb, (Gaines Dep. at 31; Henry Dep. at 31). Although plaintiff contends that "[t]his disputed evidence is important because the circumstances of [plaintiff] falling or being pushed to the concrete sidewalk . . . are material in understanding [his] injuries and the use of excessive force . . . by Mosley[,]" (Br. Opp. Mot. Summ. J. at 5), the court concludes that this is not an issue of material fact precluding entry of summary judgment. The court also concludes that where plaintiff fell is not an issue of material fact precluding entry of summary judgment.

[7] Plaintiff does not recall being examined by paramedics at the bus station. (Pl. Dep. at 66.)

4

morning and determined that he needed to go to the hospital. (Solomon Dep. at 8; Morin Dep. at 15-16.) Morin sought to have plaintiff's bond unsecured in order to allow him to go to the hospital without being placed in full restraints and accompanied by an officer,[8] and an assistant district attorney dismissed the charge. (Morin Dep. at 18; Pl. Exh. 80 (notice of dismissal).) The Sheriff's Department took plaintiff to the hospital, arranged for his bus trip from Fayetteville to his home, took him to the bus station, and ensured that he boarded the correct bus to return home. (Ford Dep. at 24-27.)

Plaintiff filed the instant action on 21 April 2006. Defendants L.A. Christian, Sheriff Earl Butler, and Western Surety Company were voluntarily dismissed on 6 August 2007, and defendant Greyhound was dismissed on 19 November 2007, all upon motion. Plaintiff's remaining claims against Mosley in both his individual and official capacities and the City of Fayetteville are for relief under 42 U.S.C. § 1983 against both defendants and additional state law claims against Mosley in his individual capacity for assault and battery and false arrest and imprisonment, and in both his individual and official capacities for malicious prosecution.

## II. MOTION FOR SUMMARY JUDGMENT

**A. Summary Judgment Standard**

Summary judgment is appropriate in cases where there is no genuine dispute as to a material fact, and in which it appears that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Haavistola v. Community Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993). Summary judgment should be granted in those cases "in which it is perfectly clear that no

---

[8] There is some evidence that Morin sought to have the charges dismissed in order to avoid "spend[ing] a bunch of money on" treating plaintiff's injuries, (Def. Exh. J at 2 (6/10/03 internal police investigative report, notes of interview with Morin)), although at his deposition, Morin stated that he does not recall making such a statement and the Sheriff's Department would "pay the bill [for plaintiff's treatment] anyway." (Morin Dep. at 33-35.)

genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." Id. In making this determination, the court draws all permissible inferences from the underlying facts in the light most favorable to the party opposing the motion. "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991).

**B. § 1983 Claims**

1. Against Mosley[9]

Mosley contends that he is entitled to qualified immunity (and therefore summary judgment) on plaintiff's § 1983 claims against him. (Br. Supp. Mot. Summ. J. at 10.) In determining whether Mosley is entitled to qualified immunity, the court's analysis must proceed in two well-established steps. First, the court must address a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). If this first question is answered in the negative, the inquiry ends. If answered in the affirmative, the court must then proceed to consider whether defendant's conduct violated "clearly established" rights of which a reasonable officer would have known. Id.

As the Fourth Circuit has stated,

The basic rules of § 1983 [qualified] immunity are well known. Underlying the

---

[9] "[A] plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself[,]" Kentucky v. Graham, 473 U.S. 159, 165 (1985). Because plaintiff has named the governmental entity (Fayetteville) as a defendant, his official capacity claims against Mosley are duplicative and must be dismissed. See Gantt v. Whitaker, 203 F. Supp. 2d 503, 508 (M.D.N.C.2002), aff'd , 57 Fed. Appx. 141 (4th Cir. 2003) (dismissing an official capacity suit against a deputy sheriff as redundant with the official capacity suit against the sheriff). The court therefore analyzes these claims against Mosley in his individual capacity only.

6

> doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights.

Rowland v. Perry, 41 F.3d 167, 172 (4th Cir.1994) (citations omitted).

*a. Arrest Claim*

"The Fourth Amendment protects 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" Devenpeck v. Alford, 543 U.S. 146, 152 (2004) (citation omitted). "A warrantless arrest of an individual in a public place for . . . a misdemeanor committed in the officer's presence . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003) (citations omitted).

> Probable cause is determined from the totality of the circumstances known to the officer at the time of the arrest. For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required. Two factors govern the determination of probable cause in any situation: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.

Brown v. Gilmore, 278 F.3d 362, 367-68 (4th Cir. 2002) (internal citations omitted). Determining whether the information surrounding an arrest suffices to establish probable cause is an individualized and fact-specific inquiry. See Wong Sun v. United States, 371 U.S. 471, 479 (1963). Consequently, the court will examine the totality of the evidence available to Mosley at the time he arrested plaintiff to determine if a reasonable officer could have believed that probable cause existed.

On the night of plaintiff's arrest, Mosley was dispatched to the Greyhound bus station

7

because plaintiff was not complying with requests to produce his ticket. Mosley approached plaintiff based on plaintiff's identification by Gaines. Mosley asked plaintiff three times to show his ticket, and plaintiff did not comply. Mosley asked plaintiff to exit the bus, and plaintiff did not comply. Plaintiff was charged with a violation of N.C. Gen. Stat. § 14-275.1, which provides that a person commits a misdemeanor if he remains on the premises of a bus station "after being requested to leave by any peace officer[.]" The court concludes that Mosley had probable cause to arrest plaintiff and, therefore, acted in a manner which was reasonable and within the scope of his duties. The court further notes that, after arresting plaintiff, Mosley brought him before a magistrate who issued the citation, "weigh[ing] heavily *toward* a finding that [Mosley] is immune." Wadkins v. Arnold, 214 F.3d 535, 541 (4th Cir. 2000) (emphasis in original).

Plaintiff contends that Mosley was merely acting as a "bouncer" for Greyhound and points to the fact that Mosley consulted with his supervisor about plaintiff's charge as evidence that "Mosley's actions were not motivated by a belief that [plaintiff] had violated any laws." (Br. Opp. Mot. Summ. J. at 19.) However, for the purpose of a qualified immunity analysis, the officer's subjective belief is not determinative: "the question is . . . whether an *objective* law officer could reasonably have believed probable cause to exist." Gomez v. Atkins, 296 F.3d 253, 261-62 (4th Cir. 2002) (emphasis added); see also Devenpeck v. Alford, 543 U.S. 146, 153 (2004) ("an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause"); Sevigny v. Dicksey, 846 F.2d 953, 958 (4th Cir. 1988) ("The inquiry is whether, under the circumstances confronted, probable cause to arrest for some offense existed, or appeared reasonably to exist, without regard to the arresting officer's subjective perceptions of either fact or law."). Plaintiff also suggests that had someone simply searched his bag and found his ticket, his arrest

8

might have been avoided altogether, (Br. Opp. Mot. Summ. J. at 5.); however, "[r]easonable law enforcement officers are not required to . . . resolve every doubt about a suspect's guilt before probable cause is established." Wadkins, 214 F.3d at 541 (quotation and citation omitted).

Because Mosley's arrest of plaintiff, taking the facts in the light most favorable to plaintiff, did not violate a constitutional right, Mosley is entitled to qualified immunity and summary judgment on this claim.

*b. Excessive Force Claim*

It is clearly established under the Fourth Amendment that individuals have the right to be free of excessive force during the course of an otherwise justified arrest. See Graham v. Connor, 490 U.S. 386, 395-96 (1989). Accordingly, the court

> must consider what a reasonable officer on the scene would have done, taking into account such factors as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . . Thus, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

Id. at 396-97; see also Milstead v. Kibler, 243 F.3d 157, 162 (4th Cir. 2001) (applying Graham standard to § 1983 excessive force claim).

In Case v. Stewart, No. 3:03-CV-388, 2007 WL 37741, *1-2 (W.D.N.C. Jan. 4, 2007), the district court awarded summary judgment on a § 1983 excessive force claim to a police officer dispatched to break up a party of teenagers. The plaintiff did not leave as ordered by the officer, who then approached the plaintiff and directed him to disperse and leave the area. Id. The plaintiff did not comply, and after a third instruction to the plaintiff to leave, the "[o]fficer . . . gave [the

9

plaintiff] a shove away from the scene[,] causing the plaintiff to "stumble[] and f[a]ll." Id. The district court noted:

> The question is whether during the execution of a constitutionally valid arrest and confronted with a subject who did not comply with verbal commands to disperse, but rather argued, refused, and proceeded with his own plans despite the clear order to do otherwise, a reasonable police officer should have known that clearly established constitutional law prohibited him from grabbing the subject by the arm and also pushing him, causing him to fall to the ground . . . . [T]he undersigned cannot conclude that the Defendant officer reasonably should have known that he was constitutionally required to delay gaining control of the Plaintiff[] and to continue to argue with him as he attempted to thwart the attempts to clear the area.

Id.

Likewise, in the instant case, the uncontroverted evidence shows that Mosley attempted multiple times to get plaintiff to either produce a bus ticket or leave the Greyhound station on his own before arresting him. With regard to the injuries sustained by plaintiff in the course of his lawful arrest, plaintiff's own testimony indicates that he simply fell, and the court cannot conclude that Mosley reasonably should have known that he was constitutionally required to "hold" plaintiff and attempt to prevent him from accidentally falling as he exited the bus. Even assuming that plaintiff was intentionally injured by Mosley,[10] there is evidence that plaintiff was attempting to struggle with Mosley and resist arrest, and thus the court concludes that any force used by Mosley was in proportion to plaintiff's resistance. Mosley is therefore entitled to qualified immunity on this claim as well.

2. Against Fayetteville

---

[10] In fact, the allegations of plaintiff's complaint, (Compl. ¶¶ 29-30), and his statement to the jail nurse are the only evidence that Mosley intentionally injured plaintiff. Although Gaines and Henry both observed plaintiff resisting arrest, they also both testified that plaintiff's injuries resulted from an accidental fall. (Gaines Dep. at 15 (plaintiff's and Mosley's "legs got tangled up or something and they fell on the sidewalk"); Henry Dep. at 32 (Mosley "stuck his leg out to stop [plaintiff from trying to walk away] while he was trying to get the [car] door open, and [plaintiff] fell over his legs").)

10

Plaintiff's failure to establish a § 1983 claim against Mosley in his individual capacity is fatal to his § 1983 claim against Fayetteville. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978); Carter v. Morris, 164 F.3d 215, 217-19 (4th Cir. 1999). Moreover, assuming *arguendo* that plaintiff "suffered a deprivation of [his] federal rights, it is by now well settled that a municipality is only liable under section 1983 if it causes such a deprivation through an official policy or custom." Carter, 164 F.3d at 218 (citing Monell, 436 U.S. at 690-91). Plaintiff cites Spell v. McDaniel, 824 F.2d 1380, 1384 (4th Cir. 1987), a case involving a brutal assault by a Fayetteville police officer of an arrestee, in support of his contention that "there was without question a custom and policy of condoning the acts of Officer Mosley, taking no proper action in an investigation when initially alerted by the Sheriff's Department, falsely reporting that Kagan had no medical treatment in Florida, as well as taking other conduct well documented in the discovery of intentional or unreasonable inaction[.]" (Br. Opp. Mot. Summ. J. at 28.) However, this contention – unsupported by any evidence related to the instant case – is completely insufficient to allow plaintiff to proceed past summary judgment on his § 1983 claim against Fayetteville. See Carter v. Morris, 164 F.3d 215, 218-19 (4th Cir.1999) (accusations of unrelated violations do not prove sufficient connection to risk of a specific injury); Massasoit v. Carter, 439 F. Supp. 2d 463, 484 (M.D.N.C. 2006).

**C. State Law Claims**

As noted above, plaintiff has also asserted state law claims against Mosley in his individual capacity for assault and battery and false arrest and imprisonment, and in both his individual and official capacities for malicious prosecution. "In North Carolina, governmental immunity serves to protect a municipality, as well as its officers or employees who are sued in their official capacity, from suits arising from torts committed while the officers or employees are performing a

11

governmental function. Furthermore, [North Carolina] courts recognize law enforcement as a governmental function." Schlossberg v. Goins, 141 N.C. App. 436, 439-40 (2000). "In order to hold an officer personally liable in his individual capacity, a plaintiff must make a prima facie showing that the officer's conduct is malicious, corrupt, or outside the scope of his official authority." Thomas v. Sellers, 142 N.C. App. 310, 313 (2001) (quotation and citation omitted); see also Schlossberg, 141 N.C. App. at 446 ("to survive [Mosley's] motion for summary judgment on the issue of . . . individual liability, [plaintiff] must have alleged and forecasted evidence demonstrating [Mosley] acted corruptly or with malice.").

1. Assault and Battery

"A civil action for damages for assault and battery is available . . . against one who, for the accomplishment of a legitimate purpose, such as justifiable arrest, uses force which is excessive under the given circumstances." Thomas, 142 N.C. App. at 315 (quotation, citation and alteration in original omitted). As noted above, the evidence does not show that Mosley used excessive force, and Mosley testified that he was not angry with plaintiff, (Mosley Dep. at 46). See Thomas, 142 N.C. App. at 313 (finding no malice on part of defendant deputy sheriff, where, among other things, the defendant "testified . . . that he acted in good faith and without malice"). Therefore, Mosley is entitled to summary judgment on this claim.

2. False Arrest and False Imprisonment

"False imprisonment is the illegal restraint of the person of any one against his will." Hales v. McCrory-McLellan Corp., 260 N.C. 568, 570 (1963) (citations omitted). "A false arrest is an

12

arrest without legal authority . . . ." Moore v. Evans, 124 N.C. App. 35, 42 (1996) (citations omitted). Because the court has already found that probable cause existed to arrest plaintiff, Mosley is entitled to summary judgment on this claim: "[p]robable cause is an absolute bar to a claim for false arrest." Williams v. City of Jacksonville Police Dept., 165 N.C. App. 587, 596 (2004) (citation omitted).

3. Malicious Prosecution

There are four elements under North Carolina law in a claim for malicious prosecution: (1) initiation by the defendant of a criminal proceeding; (2) malice on the part of the defendant in doing so; (3) lack of probable cause in the criminal proceeding; and (4) termination of the criminal proceeding in favor of the plaintiff. See Best v. Duke University, 3337 N.C. 742, 749 (1994). For the reasons stated above, plaintiff has forecasted absolutely no evidence of malice, and Mosley had probable cause to arrest plaintiff. Therefore, Mosley is entitled to summary judgment on this claim.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED, and this action is DISMISSED.

This 11 February 2008.

_____
W. Earl Britt
Senior U.S. District Judge

dk/sm/tec